Filed 4/16/25  In re M.B. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re M.B., a Person Coming Under the Juvenile Court Law. | C101985 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>F.H.,<br><br>Defendant and Appellant. | (Super. Ct. No. STKJDDP20220000018) |

Appellant, father of the minor M.B., appeals from the juvenile court's orders terminating parental rights and freeing the minor for adoption.  (Welf. & Inst. Code,[1] §§ 366.26, 395.)  Father contends the juvenile court and the San Joaquin County Human Services Agency (Agency) failed to adequately comply with the inquiry requirements of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA).  He further contends the

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

juvenile court erred when it found the beneficial parental relationship exception to adoption did not apply. We will affirm the juvenile court's orders.

BACKGROUND

In January 2022, father was found passed out in a parked vehicle with the then 18-month-old minor inside. Father, who was homeless at the time and living in his vehicle with the minor, was arrested after it was determined he was drunk and had an outstanding warrant. Father informed officers that the minor's mother died in 2020. The minor was taken into protective custody and eventually placed with the minor's maternal great-aunt.

The Agency filed a dependency petition pursuant to section 300 alleging father failed to supervise, provide for the needs of, and provide regular care for the minor due to father's abuse of alcohol and his current incarceration for past and present charges including willful cruelty to a child and disorderly conduct while under the influence of alcohol. The juvenile court ordered the minor detained and gave the Agency discretion to place the minor out of county with the maternal great-aunt.

The jurisdiction report discussed father's criminal past which included a substantial history of domestic violence with the minor's mother. The Agency subsequently requested the petition be amended to allege that father's pattern of behavior, including multiple acts of violence and aggression, posed a threat to the minor's safety and emotional well-being. On January 26, 2022, the juvenile court received the minor's birth certificate and the voluntary declaration of parentage and found father to be the minor's biological father. On July 8, 2022, the court sustained the petition as amended on the record and exercised jurisdiction over the minor, declaring her a dependent of the juvenile court.

Father's case plan included participation in drug court, parenting education, domestic violence services, and individual counseling. He made little progress during the first six months, struggling with his sobriety, testing positive for THC and alcohol

2

(sometimes immediately following visits with the minor), and getting terminated from dependency drug court. He eventually completed an inpatient substance abuse treatment program and reported to Lily Pad, a transitional housing program, so that he would have stable housing, more time to look for employment, and have recommendations for other programs to transition into. He was ultimately asked to leave the program for failure to secure funding, missed meetings, and curfew violations. Although father subsequently entered Lily Pad on two occasions thereafter, he did not remain in the program.

By July 2023, however, father had entered inpatient substance abuse treatment and was testing negative for all substances and participating in his case plan.

By November 2023, father completed parenting and domestic violence classes and individual counseling. But he remained unemployed and had not completed substance abuse aftercare treatment, nor had he graduated from dependency drug court. Father's drug court case manager testified that father continued to test negative and would likely graduate in February 2024 if all went according to plan. But father still did not believe he had a substance abuse problem and he did not understand the need for safe and stable housing for himself and the minor. At times, he downplayed his alcohol addiction, denied his need for substance abuse treatment, and failed to engage in treatment programs available to him. There were also concerns regarding father's history of domestic violence with the minor's mother and father's current girlfriend, particularly when the domestic violence correlated with times when father was not engaged in services and was testing positive. The juvenile court terminated father's services and set the matter for a section 366.26 hearing.

Over the course of the dependency proceedings, father maintained consistent visitation with the minor. At times, he lacked engagement with her but, over time, he was reportedly engaged and appropriate. He eventually transitioned from supervised to unsupervised visitation. The minor had been in the home of the maternal great-aunt (the prospective adoptive mother) for nearly a year and one-half and was bonded to the

3

caregiver and her biological children.  She had adjusted well, was thriving, and all of her needs were being met.  She was meeting and exceeding her developmental milestones and was very verbal, social, and able to express herself.  After evaluating the benefits of the minor receiving a permanent adoptive home versus detriment to the minor resulting from terminating the parental relationship, the Agency concluded that loss of the parental relationship did not outweigh the security and stability the caregiver and a permanent home could provide.

At the section 366.26 hearing on August 26, 2024, the social worker testified that, despite earlier reports of no issues, she had some concerns regarding father's visits over the past two months based on statements made by the minor.  The first incident on May 3, 2024, involved father pinching the minor.  The second incident occurred on June 21, 2024.  The minor stated father hit her hard on the leg because she did not want to give up a toy she was holding.  The third incident occurred on August 21, 2024, when father told the minor that he was going to get a new home and she was going to live with him.  During this conversation, father reportedly pulled a pair of scissors from his backpack and cut the minor's hair.  The social worker had no concerns about the veracity of the minor's statements.  The social worker testified that, on May 7, 2024, after learning about the first incident, father's visits were changed from unsupervised community visits to monitored visits.

The social worker further testified that the minor never said she wanted to go home to father and she did not say she wanted to have overnight visits with him.  The minor was happy to go to the caregiver at the end of visits.  During a June 20, 2024, monitored visit, the minor called father "Dad" and the social worker observed the minor to be happy.  The visit was appropriate but at one point, the minor was sitting on the ground watching a show on father's phone and father was sitting on the couch.  The minor tried to engage father in conversation but was only successful part of the time, as father would go back and sit on the couch and look at his phone.  At the end, father asked

4

the minor for a hug and she hugged him. Father picked up the minor and hugged and kissed her. Then, the minor put her arms out to the caregiver, who she called "Mom." The minor grabbed the caregiver's hand and walked with her out of the visitation room.

The social worker testified that, in August 2024, the minor had makeup visits with father which increased her visits to four days a week. Following those makeup visits, the minor "developed an attitude," became defiant, and refused to follow the caregiver's instructions stating, "My daddy says I don't have to." The social worker attempted to speak with father about the August 21, 2024, incident but father did not want to have a conversation. The social worker communicated with father via text admonishing him not to discuss the case with the minor.

The social worker testified the loss of the parental relationship did not outweigh the security and stability the caregiver and a permanent home could provide. She based that conclusion on the fact that the minor had been with her caregiver, the maternal great-aunt, for over two years, she called the maternal great-aunt "Mother," and she referred to her uncle and aunt as "brother" and "sister."

Father testified he regularly visited with the minor and sought increased and overnight visitation. He and the minor were affectionate with each other, they played together, and he brought food and toys and other items for her. Father testified he and the minor had been bonded ever since mother died when the minor was only four months old. At the start of visits, the minor said "Daddy," threw her arms up, ran to father, and hugged him. Father testified it would benefit the minor to have a parental relationship with him because she would have a positive male role model.

After finding the four-year-old minor adoptable, the juvenile court considered whether the beneficial parental relationship exception to adoption applied. The court found father maintained regular visitation with the minor but that, for most of her life (over two years), the minor had been in the care of her maternal great-aunt, who provided for all her needs and with whom she had bonded. The court found the exception did not

5

apply and terminated parental rights, concluding the loss of a continued relationship between the minor and father did not outweigh the benefit of the long-term permanency of adoption. Father timely appealed.

DISCUSSION

I

*Beneficial Parental Relationship Exception*

Father contends the juvenile court erred by finding the beneficial parental relationship exception to adoption did not apply. We disagree.

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are limited circumstances permitting the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One such circumstance is the beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i); *In re Caden C.* (2021) 11 Cal.5th 614, 625-626.)

The party claiming the exception has the burden of establishing supporting circumstances. (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).) The parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent -- the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, at p. 636*.)*

6

The beneficial parental relationship exception "must be examined on a case-by-case basis, taking into account the many variables which affect a parent[-]child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent[-]child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576.) The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re Caden C.*, *supra*, 11 Cal.5th at p. 630.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Id.* at pp. 640-641.)

As a preliminary matter, the Agency argues the juvenile court found father to be the minor's biological father but, because father never provided the court with the minor's birth certificate[2] and never requested that his status be elevated to that of a presumed father, he had no right to an express finding of unfitness or detriment before termination of his parental rights and the court needed only find that it was in the minor's best interest to terminate parental rights. Assuming without finding that the documentation provided by father to the court and evidence that he had the minor in his care for approximately 14 months after mother died was sufficient to confer presumed father status on him for purposes of applying one of the exceptions to adoption, we proceed to address father's claim with respect to the applicability of the beneficial parental relationship exception.

In any event, it is undisputed that father maintained consistent visitation and contact with the minor, satisfying the first element. As for the second element—that the

---

[2] The Agency is mistaken. Father presented the minor's birth certificate and the voluntary declaration of parentage to the juvenile court on January 26, 2022, the date the court found him to be the minor's biological father.

minor had a substantial, positive, emotional attachment to him—father argues he and the minor had a beneficial relationship the continuation of which would benefit the minor, as evidenced by the fact that he was engaged with the minor during visits and taught her things, he parented her by wiping her nose and checking on her when she fell, and he brought diapers, toys, books, and clothes for her. The minor was affectionate toward him, she called him "Dad" and said, "I love you Daddy," and there were times when she did not want to leave the visit.

Even assuming father met his burden to prove the second element, he did not meet his burden to prove the third element, that the attachment was so significant that terminating it would be detrimental to the minor even when balanced against the countervailing benefit of a new, adoptive home. (*In re Caden C.*, *supra*, 11 Cal.5th at p. 636; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) While the minor, four years old by the time of the section 366.26 hearing, spent approximately 14 months of her life in father's care after mother died, she has spent over two years with the maternal great-aunt and her children. And while the minor had a strong emotional bond with father, she had an equally strong emotional bond with maternal great-aunt and the maternal uncle and aunt, whom the minor referred to as "Mom" and "Mommy," and "brother" and "sister," respectively. The social worker testified the minor never said she wanted to go home to father or have overnight visits with him. The minor enjoyed most visits with father but was happy to go to the maternal great-aunt when visits were done. At the end of one visit, father was hugging and kissing the minor at the end of a visit when the minor put her arms out to the maternal great-aunt, called her "Mom," grabbed her hand, and left the visitation room with her. There were other visits, three in particular, during which the minor reported concerning behavior by father: he pinched her on the back of the leg; he hit her hard on the leg because she refused to give up a toy; and he told her he was going to get a new home and she would live with him and then pulled out a pair of scissors from his backpack and cut her hair. The minor also "developed an attitude" after the

8

number of visits increased to accommodate makeup visits. She became defiant and refused to follow the caregiver's instructions.

We reject father's argument that the Agency failed to ascertain the minor's feelings about being adopted pursuant to section 366.22, subdivision (c)(1), which provides that, when a section 366.26 hearing is ordered, the juvenile court "shall direct the [A]gency" to prepare an assessment that includes, among other things, "a statement from the child concerning placement and the adoption or legal guardianship . . . unless the child's age or physical, emotional, or other condition precludes their meaningful response . . . ." Suffice it to say that the minor had just turned four years old at the time of the section 366.26 hearing. While she was described as "very verbal" and was able to tell the social worker about the information from father that "she would be visiting him, having overnight visits with him, and would be living in his new home," there was no evidence presented at the hearing or here on appeal that suggests she was capable of understanding the concept of parental rights being terminated or adoption or legal guardianship as a permanent plan.

We conclude the juvenile court did not err by finding the beneficial parental relationship exception to adoption did not apply.

II

*ICWA*

Father claims the juvenile court erred in finding the Agency undertook a proper ICWA inquiry of the paternal extended family members.[3] We find the claim lacks merit.

---

[3] Father makes no claim with respect to the adequacy of the Agency's ICWA inquiry of the maternal extended relatives. We therefore limit our discussion to facts relevant to the Agency's inquiry of the paternal extended family members.

9

***ICWA Background***

Father initially stated there was no known Indian ancestry on his side of the family. He completed a parental notification of Indian status form (ICWA-020) confirming as much. Regarding paternal extended family members, father identified two of the minor's paternal uncles D. and R. and provided their addresses but no telephone numbers. He also identified the minor's paternal great-aunt S.S. but did not provide an address or telephone number for her.

Social workers interviewed paternal uncles D. and R. about possible placement of the minor. The paternal uncles identified paternal aunt C., who told social workers she could not accept placement of the minor. She also told them that paternal great-aunt would have contact information for the maternal relatives. The social workers' attempts to contact the paternal great-aunt were unsuccessful. It does not appear the social workers asked the paternal aunt or uncles about possible Indian heritage.

The Agency, however, mailed ICWA-020 forms to paternal uncles D. and R. and the paternal great-aunt, as well as paternal uncles L., D.G., and M., the paternal aunt J., and minor's godmother. After waiting 60 days and receiving no responses, the Agency requested the juvenile court find the ICWA not applicable.

The Agency also conducted a LexisNexis search regarding the paternal great-aunt, all five of the paternal uncles, paternal aunt J., and the godmother. Those reports either did not produce an active telephone number, produced a telephone number that did not result in successful contact, or produced a telephone number that permitted the social worker to leave a voicemail message but the message was never returned.

At the section 366.26 hearing on August 26, 2024, the Agency directed the juvenile court's attention to its July 2024 addendum report which detailed the Agency's efforts to comply with the ICWA inquiry requirements. Over father's objection, the juvenile court found the ICWA did not apply.

*Applicable Law*

"The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency proceedings. [Citations.] A major purpose of the ICWA is to protect 'Indian children who are members of or are eligible for membership in an Indian tribe.' " (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.) The ICWA defines an " 'Indian child' " as a child who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) "Under ICWA's state analogue, the California Indian Child Welfare Act (Cal-ICWA . . .), courts and child welfare agencies are charged with 'an affirmative and continuing duty to inquiry whether a child . . . is or may be an Indian child' in dependency cases." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125; § 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a).)

"[S]ection 224.2 creates three distinct duties regarding ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his [or her] family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is

11

an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

On appeal, we review ICWA findings and orders for substantial evidence. (See *In re D.S.*, *supra*, 46 Cal.App.5th at p. 1051.) A finding that ICWA does not apply is "subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).) The juvenile court's "fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1141.)

*Analysis*

Father claims the juvenile court's findings are not supported by the evidence because the Agency's ICWA inquiry was inadequate in that it interviewed numerous paternal relatives but made no effort to inquire of them regarding possible Indian ancestry. He further claims the Agency was required to follow-up the unanswered ICWA-020 forms it mailed to the various paternal relatives with telephone calls to fulfill its continuing duty of inquiry. We are not persuaded on either count.

Father denied any Indian ancestry in his family. He never wavered from that position. As the social worker indicated in the record, father gave no reason to believe or to know that the minor was an Indian child for ICWA purposes. When asked about extended family members who might have information about possible Indian heritage, father identified three individuals, two paternal uncles and the paternal great-aunt. He was able to provide only an address for the paternal uncles and was unable to provide any contact information for the paternal great-aunt. Thereafter, the Agency conducted interviews and LexisNexis searches which successfully identified a number of additional paternal relatives and some contact information for those individuals as well as telephone numbers for the relatives identified by father. However, the Agency's attempts to contact those individuals were unsuccessful because the telephone numbers were wrong, inactive, or not in service or the individual did not return the call.

12

The Agency, as part of its continuing duty of inquiry, also sent ICWA-020 forms to all five of the paternal uncles, as well as paternal aunt J., paternal great-aunt S.S., and godmother C.A. at the address provided by father and the paternal uncles. None returned completed ICWA-020 forms or responded in any way to the Agency.

Father nevertheless argues the continuing duty of inquiry required that the Agency follow-up its ICWA correspondence with telephone calls. This proposition fails for two reasons. First, father fails to cite any specific authority to support the argument. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408, quoting *Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647 [a point asserted without argument and authority "is deemed to be without foundation and requires no discussion by the reviewing court"].) Second, while the Agency has an affirmative and continuing duty of ICWA inquiry (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1125; § 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a)), the Agency "is not required to 'cast about' for information or pursue unproductive investigative leads" (*In re D.S.*, *supra*, 46 Cal.App.5th at p. 1053). Follow-up calls by the Agency would have been futile, as all previous efforts to obtain correct information and contact the paternal extended family members were unsuccessful.

Father likens this case to *In re J.C.* (2022) 77 Cal.App.5th 70, *In re Antonio R.* (2022) 76 Cal.App.5th 421, *In re H.V.* (2022) 75 Cal.App.5th 433, and *In re Dezi C.*, *supra*, 16 Cal.5th at page 1112. But all of those cases differ from the instant matter in that the respective agencies inquired of the parents but never inquired of some or all of the extended relatives. (See *In re J.C.*, at pp. 75-76 [agency inquired of parents and obtained signed ICWA-020 forms but did not inquire of extended relatives with whom agency made contact]; *In re Antonio R.*, at pp. 426, 430-431 [agency inquired of parents and paternal great-grandmother but failed to inquire of maternal relatives designated as prospective adoptive parents or present in courtroom during hearing]; *In re H.V.*, at pp. 436, 438 [agency inquired of mother only]; and *In re Dezi C.*, at pp. 1126-1127

[agency spoke with paternal and maternal extended family members but never asked about possible Indian ancestry].)

Here, by contrast, the Agency communicated with the paternal relatives by sending each of them ICWA-020 forms. "The duty to inquire . . . begins with 'the initial contact' (§ 224.2, subd. (a).) [The Agency's] initial duty to inquire includes asking the child, parents, legal guardian, extended family members, and others who have an interest in the child whether the child is, or may be, an Indian child. (*Id.*, subd. (b).)" (*In re D.F.* (2020) 55 Cal.App.5th 558, 566, italics omitted.) The ICWA-020 form sent to the paternal relatives asked, among other things, whether the individual or the minor is or may be a member of or eligible for membership in a federally recognized Indian tribe, and whether the individual's parents, grandparents, or other lineal ancestors is or was a member of a federally recognized Indian tribe. As the Agency concedes, it did not ask paternal uncles D. and R. or paternal aunt C. about possible Indian heritage during their initial in-person interview. However, the duty only *begins* at that point of contact and the Agency fulfilled its *continuing duty* of inquiry by sending those and the other paternal relatives ICWA-020 forms specifically *asking* them whether the minor might be an Indian child.

Thus, we reject father's claims that the juvenile court failed to ensure the Agency completed a proper ICWA inquiry. " 'On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case.' " (*In re Kenneth D.* (2024) 16 Cal.5th 1087, 1101-1102.) Here, the record contained the Agency's July 2024 addendum report regarding ICWA compliance. The report provided details regarding each paternal (and maternal) relative identified and efforts to contact those individuals, either in person, by telephone, or both and its continued inquiry efforts by sending ICWA-020 correspondence to those individuals. The Agency directed the court's attention to the July 2024 report at the section 366.26 hearing and the court found the

ICWA "does not apply based on the information provided."  The court's exercise of its discretion was proper.

DISPOSITION

The juvenile court's orders are affirmed.


/s/_____
WISEMAN, J.*

We concur:


/s/_____
BOULWARE EURIE, Acting P. J.


/s/_____
MESIWALA, J.

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.